576 So.2d 615 (1991)
Michael and Dale BOUDREAUX
v.
FREEPORT CHEMICAL COMPANY.
No. 90-CA-0257.
Court of Appeal of Louisiana, Fourth Circuit.
February 28, 1991.
*616 Estelle E. Mahoney, Louis J. St. Martin, Houma, for plaintiffs/appellants.
William B. Gibbens III, Gibbens & L'Hoste, New Orleans, for defendant/appellee.
John F. Young Jr., Richard G. Duplantier, Jr., Hebert, Mouledoux & Bland, New Orleans, for intervenors/appellants.
Before ARMSTRONG, PLOTKIN and BECKER, JJ.
ARMSTRONG, Judge.
Plaintiffs, Michael and Dale Boudreaux, husband and wife, (hereinafter Michael will be referred to as "plaintiff") instituted this action against Freeport Chemical Company (hereinafter "Freeport"), seeking damages incurred as a result of injuries sustained by Michael Boudreaux while performing work for his employer, C.E.I. Fabricators, Inc. (hereinafter "C.E.I."), which had contracted to perform work for Freeport at its Uncle Sam Chemical Plant in Convent, Louisiana. Freeport moved for a summary judgment on the ground that it was the "statutory employer" of plaintiff, and thus was liable to him only in worker's compensation, not in tort. The trial court granted Freeport's motion, dismissing plaintiffs' suit against it. From this judgment plaintiffs now appeal.
A summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La.C.C.P. art. 966; Charles v. Faust, 487 So.2d 612 (La.App. 4th Cir. 1986). Summary judgments are not favored and any doubt will be resolved against the granting thereof. Civello v. Johnson, 567 So.2d 643 (La.App. 4th Cir. 1990), writ denied, 569 So.2d 987 (La.1990). The mere belief that a litigant will be unlikely to prevail at trial is not a sufficient basis to warrant the granting of a summary judgment. Civello v. Johnson, supra; Laufer v. Touro Infirmary, 334 So.2d 541 (La.App. 4th Cir. 1976).
The issue on appeal is whether there is any genuine issue as to material fact concerning Freeport's status as a "statutory employer."
La.R.S. 23:1061, as in effect at the time of plaintiff's injury, provided in pertinent part:
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation ... and contracts with any person (in this section referred to as contractor) for the execution by ... of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the *617 principal shall be substituted for reference to the employer...."
The principal referred to in La.R.S. 23:1061 is considered the "statutory employer" of an employee of the company with whom the principal contracts for the execution of its work. Under La.R.S. 23:1032, if an employee of a contractor is injured while executing the work of the principal, which work the principal was engaged in at the time of the employee's injury, the employee's remedy against the principal is limited to benefits under the Louisiana Workers' Compensation Law. In such a case the statutory employer/principal is immune from suit in tort by the contractor's employee.
In Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), the Louisiana Supreme Court set out in detail the analysis used to determine whether a statutory employment relationship exists. The court stated:
"Basically, a determination of whether a statutory employment relationship exists involves a three level analysis. In the first level, the primary focus is on the scope of the contract work. `The specific task to which an individual employee is put should not be determinative of his coverage under the Act. Instead, the entire scope of the work contract must be considered.' The central question to be answered is whether the contract work is specialized or non-specialized. This is of course a question of fact, and courts should consider whether the contract requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal's trade, business or occupation, and the principal is not the statutory employer of the specialized contractor's employees. In this situation, `the purpose behind the rule is not violated and the reason for holding the principal directly liable in compensation exclusively does not come into play' because the contractor is an independent business enterprise, rather than a mere intermediary interposed to avoid compensation responsibility.
"If it is determined that the contract work is non-specialty, then the inquiry shifts to a comparison of the principal's trade, business or occupation and the contract work to see if the latter can be considered a part of the principal's trade, business or occupation. The jurisprudence has forged several guidelines, in no way exhaustive, which can aid a court in resolving this factual issue:
(1) Is the contract work routine and customary? That is, is it regular and predictable? Nonrecurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage.
(2) Does the principal have the equipment and/or manpower capable of performing the contract work? This is a sub-species of the specialty inquiry. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees.
(3) What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work?
"These guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be nonspecialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. Basically, the factors developed by the jurisprudence strive to answer the overriding question of `whether [the contract work] is, in that business, normally carried on *618 through employees rather than independent contractors.'
"Lastly, the court must determine if the principal is engaged in the work at the time of the alleged accident. La.R.S. 23:1032. At this level `[i]t is irrelevant that the principal has the financial resources or expertise to enter into a particular trade, business or occupation. In order for any person to come within the scope of the statute, he must be engaged in the enterprise at the time of the injury.'"
(citations omitted)
Plaintiff was injured working at the Freeport plant on the morning of June 8, 1987, the first day of his job with his immediate employer, C.E.I. He was working with a handful of other workers, including at least two Freeport employees, removing a section of fiberglass duct pipe when he fell from a handrail on which he was standing.
The record contains a "Letter Agreement" dated July 1, 1987, submitted by C.E.I. to Freeport, providing that C.E.I. would furnish Freeport with "skilled craftsmen and safety equipment at Freeport's Uncle Sam plant." The agreement further provided that that all work performed by C.E.I. meet the approval of Freeport's engineers or inspectors, but that the detailed manner and method of doing the work be under the control of C.E.I. Freeport was to be only interested in the results obtained and C.E.I. was to be considered an independent contractor.[1]
Plaintiffs submit that the agreement between Freeport and C.E.I. established that the work to be performed under the contract was specialized. They also submit that the agreement "rendered" the contract work specialized per se, and thus, as a matter of law, not a part of Freeport's trade, business or occupation.
The agreement did not specify the type of work C.E.I. workers would be performing, nor did it specify what skills they, as "skilled craftsmen," need possess. There is in the record a letter from C.E.I. to Freeport, dated June 2, 1987, in which C.E.I. quotes "the following rates for furnishing skilled craftsmen for your turnaround." Rates are quoted for a "working foreman," and for "pipe welders" and "fitters." The rates included the craftsmen and necessary safety equipment. Depositions and affidavits filed in support of and in opposition to Freeport's motion for summary judgment established that approximately forty C.E.I. employees were to be used by Freeport in the performance of its "turnaround" maintenance of the Uncle Sam Plant. A Freeport employee, Anthony Calcagano, explained in his affidavit what "turnaround" is. He stated:
"Turnaround is a process whereby the plant or a portion of the plant is shutdown and the machinery and piping systems are cleaned, refurbished, overhauled or replaced. The object of turnaround is to bring the plant back up to optimal efficiency so that it operates as well as it did when it was first constructed."
Calgano, stated that "general mechanics" at Freeport did turnaround work. General mechanics performed a number of services at the plant each day depending on the need. He said that in June 1987 it was decided to hire contractors to help with the turnaround. He further said that C.E.I. supplied welders, pipefitters and workmen solely for that reason. He said it was understood that C.E.I. workers would work at the direction of Freeport and perform whatever tasks assigned by Freeport during the operation. He said that turnarounds were "often" annual operations, usually done in the summer, although they were "sometimes" done in the winter. The exact dates were determined by Freeport's marketing and economic officers.
In his deposition, plaintiff, Michael Boudreaux, stated that when he went to work *619 for C.E.I. he was told he would be doing "maintenance work," some pertaining to pipe, some to tanks on the plant grounds. He said that he was told his job foreman would be a C.E.I. employee. He said that one particular Freeport employee was working with him and doing the same thing he was. Boudreaux said he was not a certified pipefitter, but had started as a maintenance worker years before and learned pipefitting skills on-the-job. He said he went to work as a "fitter" at the Freeport, but the work did not always involve pipe, sometimes valves or valve stems, or vessels (tanks). The Freeport Chemical Company accident report filled out after plaintiff's accident listed his job title as "Pipefitter."
David Zeringue was a general manager of C.E.I. in June 1987. He said in an affidavit that no particular job skills were required of the approximately forty people it hired for the work at Freeport. He remembered plaintiff, Michael Boudreaux, as being one of the workers C.E.I. hired on a temporary basis to perform turnaround work at the Freeport plant. He stated that:
"[Plaintiff] and the others were referred to as mechanic helpers and it was understood by C.E.I. that they were not provided for any skilled labor or specialty work, but simply to assist the [Freeport] people in overhauling the piping, vessels, pumps and valves in the short period of time allotted for turnaround at the [Uncle Sam] plant."
Zeringue further stated:
"It is my understanding that turnaround is a very rapid operation which is routinely performed by chemical plants along the Mississippi corridor. It is typically done in a very short period of time, and eighty-five to ninety percent of the turnaround operations which I know about are conducted on a round-the-clock work schedule.... [I]t is my understanding that turnaround is a recurring and normal part of the chemical production industry."
Michael Jacques, a nineteen-year employee of Freeport, was working at the Uncle Sam Plant in June 1987 as a relief foreman. He assigned jobs to "mechanics." Jacques stated that there were approximately one hundred mechanics at the plant who were capable of doing turnaround work; that Freeport employees can perform the entire turnaround operation; that Freeport has the equipment necessary to perform the entire turnaround operation; and that C.E.I. did not provide any additional equipment for the turnaround work. He said in June 1987 Freeport employees were performing turnaround work, with C.E.I. employees assisting them, working side by side. He knew of no C.E.I. employee who was given the title of "Foreman" during the June 1987 turnaround. Jacques did not observe that C.E.I. employees possessed any special skills that Freeport workers did not. In fact, he said the C.E.I. employees were basically doing manual labor. He said that Freeport had welders and pipefitters on its payroll in June 1987, and that if he needed any of them during the turnaround he could obtain them. Jacques brought along a list of the names of Freeport's general mechanics. Most were categorized as "Industrial Maintenance Mechanics," several as "Chemical Laboratory Technicians." Each industrial maintenance mechanic had a special skill listed, such as pipefitting, welding, machinist, carpentry, or electrical.
Jacques stated that these industrial maintenance or general mechanics perform turnaround "constantly" or "weekly." He distinguished this type of turnaround from "major" turnarounds, which he said were done every six months. He later said that there had been some years in the past where the major turnaround had been performed only on an annual basis. Questioned further as to the difference between weekly and major turnarounds, Jacques said that with a major turnaround the "whole" plant is shut down, usually for two to three weeks; the weekly turnarounds only involved shutting down certain areas of the plant for perhaps twelve hours.
When he was asked whether major turnarounds had ever been performed using *620 only Freeport employees, Jacques replied, "I can'tI don't know. Unh-unh (negative response)." It is a little unclear whether by his negative response he was communicating that no, major turnarounds had never been performed using only Freeport employees, or whether he was simply confirming that he didn't know. Later in his deposition, Jacques confirmed that Freeport had hired extra people to help with some previous major turnarounds. He further confirmed that Freeport hired the extra people to do the June 1987 major turnaround because they could not do it without them. Jacques stated that Freeport hired extra people to assist in major turnarounds so that the plant could start up earlier.
Michael Jacques did not know whether other plants in the area hired outside people for turnaround work or whether they relied on their own employees. Anthony Calcagano stated that it was common practice among plants and refineries through the Mississippi corridor to make a decision based upon market factors about the length of time to be allocated to turnarounds, and the use of, and extent of the use of, outside contractors. However, he further stated that:
"[B]ecause turnaround is nearly always time critical, with short deadlines imposed by the exorbitant costs of closing down operations while turnaround is performed, most plants will usually require extra workers to come in and assist with turnaround."
The trial court found that the work C.E.I. contracted to perform for Freeport was part of the regular trade, business and occupation of Freeport. It found, in so many words, that Freeport was engaged in this work at the time of plaintiff's injury. The court interpreted Berry, supra, as implicitly rendering moot the issue of specialization if the principal itself is engaged in the specialty, regardless of the degree of specialization.
The evidence shows that plaintiff, while not certified, was in fact a pipefitter by trade. Plaintiff narrowly focuses on pipefitting and welding as the scope of the contract work, and in making this assertion he relies on the letter quoting rates for these workers, not the explicit terms of the contract between the parties. However, we believe that Berry, supra, contemplates a broader view. The court states that "the entire scope of the contract work must be considered." Id. at 938. The evidence establishes that C.E.I. contracted to furnish workers it knew would be used to supplement Freeport's own employees in performing the turnaround work. Freeport employed one hundred workers who routinely performed turnaround work, though perhaps not the complete major turnaround jobs. Only safety equipment was called for in the contract, all operational equipment was furnished by Freeport. Under these circumstances we find that there is no genuine issue of material fact concerning whether the contract work was specialized per se. It was not.
In reaching this finding we see no conflict with this court's previous decision in Roberts v. Amstar Corporation, 496 So.2d 1146 (La.App. 4th Cir.1986). In Roberts the plaintiff, a pipefitter, was employed by a company which contracted to replace a water line for turbines at a sugar refinery. The only evidence concerning the scope of the contract work was the contract itself. Based upon the description of the work contained in the contract, we found that the skill, training, experience, education and equipment required for the contract work was not normally possessed by persons outside the field of pipefitting. The contract called for replacing water lines which had been in place since 1949, and although the sugar refinery employed its own pipefitters, none were involved in that work at the time of the plaintiff's accident. We found that the contract work was specialized per se, and also that it was not a part of the principal's trade, business or occupation. In the instant case, the contract work involves the ordinary and recurring, rather than the extraordinary found in Roberts.
Finding that the contract work is not specialized per se, the inquiry now shifts to a comparison of Freeport's trade, business or occupation and the contract work, turnaround work, to see if the latter can be *621 considered a part of Freeport's trade, business or occupation.
We now apply the guidelines set out in Berry, supra. First, we examine the issue of whether the contract work can be considered customary and routine. The weekly as well as annual and/or semiannual turnarounds can be considered recurring and ordinary. The work can be said to be regular and predictable, i.e. routine and customary.
We next consider whether Freeport had the equipment and/or manpower capable of performing the contract work. The primary focus is on determining whether the contract work as relates to Freeport is handled ordinarily through employees. Based upon the evidence before us, the weekly turnarounds are handled exclusively by Freeport employees, with its own equipment. The major turnarounds are handled by Freeport employees, with extra help to aid them in accomplishing the task in the time allotted. The evidence also clearly establishes that Freeport has the equipment necessary to perform a major turnaround.
Third, we look at the practice in the industry. The evidencemost notably the affidavit of Freeport's own employee, Anthony Calcaganopreponderates in favor of a finding that it is the practice in the industry to hire extra people to perform major turnarounds. However, it is not precisely clear that this is the case. It is also not clear whether it is the practice in the industry for plants to have their own employees even perform routine turnarounds. However, these questions do not constitute genuine issues of material fact. The contract work was turnaround work. The evidence clearly shows that turnaround workthe weekly variety as well as the major overhaulsis a necessary part of Freeport's trade, business or occupation. Turnaround work is in the category of general maintainence and repair work, rather than the type of extraordinary contract work normally considered as outside of La. R.S. 23:1061. By its very nature turnaround work allows the smooth and continued operation of Freeport's Uncle Sam chemical plant and is within the scope of coverage under the Louisiana Worker's Compensation Law.
Finally, the evidence clearly establishes that Freeport employees were engaged in performing turnaround work at the time of plaintiff's injury.
For these reasons we find that there was no genuine issue of material fact concerning Freeport's status as the statutory employer of plaintiff under La.R.S. 23:1061 it was. Accordingly, plaintiff's sole remedy against Freeport lay under the Louisiana Workers' Compensation Law. La.R.S. 23:1032. Freeport was entitled to judgment as a matter of law, dismissing plaintiff's suit in tort.
For the foregoing reasons we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] This "Letter Agreement," referred to as such by Freeport in a letter to C.E.I. dated March 8, 1988, was "accepted" by Freeport "as" of August 4, 1987, almost two months after plaintiff's accident. However, it apparently reflects the terms of the relationship between Freeport and C.E.I. at the time of plaintiff's accident. The record and briefs of the parties reflect no issue of fact as to this aspect of the case.